Richard J. MANDIA

v.

ARCO CHEMICAL COMPANY.

Civ. A. No. 83–1529.

United States District Court,
W.D. Pennsylvania.

Sept. 30, 1985.

Stanley Stein, Pittsburgh, Pa., for plaintiff.

Charles Kenrich, Dickie McCamey & Chilcote, Jess Womack, Arco Chemical Co., Philadelphia, Pa., for defendant.

## OPINION

GERALD J. WEBER, District Judge.

Plaintiff filed an action against Defendant under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, specifically under Section 2000e–3(a) relating to unlawful discrimination in employment against an employee who has opposed discrimination in employment, or against an employee who has assisted or participated in any manner in an investigation or proceeding under Title VII.

Plaintiff's Complaint in ¶ 17 alleges that his termination:

> ... was solely the result of Mason-Mandia's filing of the EEOC claim against ARCO, as well as the result of Mandia's expressed opinion in support of his wife's claim, ...

(Mason-Mandia refers to plaintiff's wife).

The statute creates and the cases recognize two types of retaliation discharges under Section 2000e–3(a); the *opposition* clause, because "he has opposed any practice made an unlawful employment practice by this Title," i.e. see *Great American Federal Savings and Loan v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), and the second, the *participation* clause, "because he made a charge, testified, assisted ... or participated in any manner in any investigation, proceeding or hearing under this Title."

■ The plaintiff has failed to carry the burden of proving that he is within the protected activity of the statute by *opposing* any unlawful employment practices. One of the functions of his job was to guard against, investigate, and report any such practices. He was well familiar with the concept of sexual harassment, he wrote the employee manual, he conducted a seminar on the topic, he was familiar with the EEOC procedure and was familiar with what an EEOC charge would produce. While he complained of employment practices within the company's plant at Beaver Valley, there is no evidence that he raised any question of sexual harassment.

■ With respect to the *participation* element, the evidence is clear that he participated, supported and aided his wife in the filing of the EEOC charge on November 3, 1982 with relation to sexual harassment. It is solely by reason of his wife's charge that he could be considered to have made any allegation of sexual harassment against his employer, and thus be engaged in a protected activity. We will concentrate on the evidence surrounding the claim that his discharge from employment arose out of the filing by his wife of a complaint under Title VII against her employer, the same employer as her husband's, the defendant here. This is retaliation against a third-party because of the filing of a Title VII complaint by a close relative. We conclude that Section 2000e–3 proscribes such retaliation. *See De Medina v. Reinhardt,* 444 F.Supp. 573 (D.D.C.1978) and *Kornbluh v. Stearns and Foster Co.,* 73 F.R.D. 307 (N.D.Ohio 1976).

The wife's EEOC complaint against ARCO Chemical was filed November 3, 1982 and alleged sexual harassment by her supervisor at the ARCO Chemical Co. Beaver Valley Plant. Sexual harassment is a form of sex discrimination prohibited in employment by Title VII. The prohibition "is violated when a supervisor, with the actual or constructive knowledge of the employer, makes sexual advances or demands toward a subordinate employee and conditions that employee's job status—evaluation, continued employment, promotion, or other aspects of career development—on a favorable response to those advances or demands, and the employer does not take prompt and appropriate and remedial action after acquiring such knowledge. *Tomkins v. Public Service Electric and Gas Company,* 568 F.2d 1044, 1048–1049 (3d Cir.1977).

This case presents a complex background, almost Byzantine in its involvements, and with enough characters and incidents to provide a full season of soap opera. The plaintiff, Richard Mandia, has a B.S. degree in psychology, an M.S. degree in behavioral science, with training and experience in psychological counseling.

He was hired by ARCO Chemical Company in 1979 in Philadelphia, as Manager of Management Development and was transferred on September 22, 1980 to ARCO's Beaver Valley Plant as Manager of Employee Relations. His chain of command was to Carl Simmons, Manager of Employee Relations in Philadelphia; then to William Edmunds, Director of Employee Relations in Philadelphia, and finally to Jack Oppasser, Vice-President of Employee Relations in Philadelphia.

Under Mandia at the Beaver plant were Fernand Price, Supervisor of Salaried Personnel; and A.L. Rice, Supervisor of Labor Relations.

Mandia received competent (3+) performance evaluations on May 2, 1981 and March 4, 1982. He received merit salary raises in 1980, 1981 and 1982.

Cheryl Mason (later Cheryl Mason-Mandia) was a registered nurse who was hired as a part-time nurse at the Beaver Valley Plant in January 1981. She was interviewed by Richard Mandia at that time and they became good friends. She was hired as a full time nurse in September 1981. Mandia was giving her psychological counseling during 1981 because of the effects on her of the mental instability of her husband, Paul Mason, who committed suicide on October 14, 1981. Mandia had separated from his second wife in 1981. Thereafter Cheryl Mason and Richard Mandia dated each other, attended the company Christmas party together in 1981, became lovers and were married in April 1982.

On May 21, 1982, Cheryl Mason submitted her letter of resignation to ARCO Chemical and it was accepted June 11, 1982. She filed a claim for Pennsylvania Unemployment Compensation and testified at a hearing that she was forced to leave her employment because she was being harassed, but she did not mention sexual harassment.

Dr. Jack Kerns was the medical director of the Beaver Valley Plant from January 1981 through July 1982. He is the supervisor that was the target of Mrs. Mason's

harassment complaint to the EEOC. She testified to being bothered by being touched, by lewd jokes, by calls to her at home. She testified that she was offered the position of head nurse with a suggestion of sexual favors in return, but the post went to another nurse. She testified this head nurse got favorable treatment, and that she was assigned to menial and clerical duties. She also blamed the new head nurse for harassment.

She made specific complaints within the company. The first concerned the action of Dr. Kerns in docking her for four days pay in October 1981 for absence without calling in. In this matter she consulted Mandia who turned the matter over to Fernand Price, Supervisor of Salaried Personnel. It was resolved by a reimbursement.

In 1982 she was evaluated below average in competence by Dr. Kerns and wrote to him asking reconsideration and review by Dr. Lippin, Kern's superior in Philadelphia. A meeting was held on the matter at a company conference in Philadelphia.

During the period in 1981 Cheryl Mason was involved in psychological counseling with Richard Mandia. Mandia testified that she was referred to him for this, but Dr. Kerns denies this because the company had full scale psychiatric counseling available to employees and would not refer anyone to Mandia, whose academic credentials he did not regard highly.

While Cheryl Mason may have told her friend, counselor, lover and husband that she was a victim of sexual harassment by Dr. Kerns there is no recorded evidence of a specific recorded complaint of sexual harassment either by Cheryl Mason or by her husband Richard Mandia in any of the many documents entered as exhibits here.

On March 1, 1982, Cheryl Mason wrote to Dr. Kerns objecting to her 3 minus rating and mentioning problems with a co-worker. (Defendant's Exhibit 109).

On May 21, 1982, Cheryl Mason wrote a letter of resignation to ARCO, which does not mention sexual harassment as a reason for leaving. (Defendant's Exhibit 3).*

On September 27, 1982, Cheryl Mason testified before the Pennsylvania Unemployment Commission as to the reasons for her leaving employment. When asked to explain her claim of harassment she did not claim sexual harassment.

On October 4, 1982, Cheryl Mason wrote to the Pennsylvania Unemployment Compensation Commission that she resigned because of harassment by her superior, head nurse Judy Warwick. (Defendant's Exhibit 32).

Similarly there is no record that plaintiff Richard Mandia ever recorded a specific complaint of sexual harassment by Cheryl Mason. Mandia testified that he was familiar with the meaning of sexual harassment, that he had prepared the employee's handbook covering such complaints, that he had given a training program on sexual harassment, furnished by the company, and that it was his duty to report complaints of sexual harassment to his superiors in the chain of command.

Nowhere in the evidence is there any formal report of any complaint of sexual harassment of Cheryl Mason. Mandia had referred her complaint of pay docking to Fernand Price, he had talked to William Edmunds, the Director of Employee Relations in Philadelphia, about conditions in the medical center. Mandia's testimony, as to mentioning sexual harassment specifically is vague, but Edmunds denies that it was raised. He complained about the treatment of Cheryl Mason in reference to the low performance evaluation.

On June 3, 1982, after being told to put his report in writing, Mandia wrote an extensive memorandum to his superior, William Edmunds, in reference to personnel problems in the Medical Department. There is extensive reference to the problems of Nurse Mason in the report, but no

---

* Throughout this proceeding all documentary evidence has identified the plaintiff's wife as Cheryl Mason, despite her April 1982 marriage to plaintiff, Richard Mandia. This includes the EEOC charge filed November 3, 1982.

mention of any problem of sexual harassment. It dealt with the complaint that Nurse Mason's professional skills were not being utilized.

Neither Edmunds nor Oppasser were aware that Nurse Mason was Mandia's wife.

Edmunds' and Oppasser's reaction to the report was that the Medical Department of Beaver-Valley was not within their chain of command, nor under Mandia's jurisdiction. The Medical Department at Beaver Valley reported to a superior in Philadelphia, Dr. Richard Lappin, who in turn reported to superiors in Los Angeles.

Edmunds and Mandia personally discussed this report. Mandia testified that Edmunds made some remark that if Mandia's wife made a complaint of sexual harassment it would cost Mandia his job. Edmunds denies this remark. Edmunds and Oppasser took no further action on the matter because they learned that Dr. Kerns was taking employment elsewhere within a month. Alxander L. Rice, Mandia's subordinate as Employee Relations Supervisor of the Beaver Valley plant, who was discharged on the same date as Mandia and for the same reason, testified that Richard Mandia discussed Cheryl's troubles in her employment in the medical department, but never used the words sexual.

Dr. Kerns testified that Mandia talked to him about Cheryl's treatment obliquely in conversations about other subjects. The matter was presented by Mandia stating that the chief nurse, (Judy Warwick) was treating Cheryl unfairly or that Judy was "setting Cheryl up". No mention of sexual harassment was made. This is somewhat surprising in that Mandia as Cheryl's close friend, lover, and later as husband, would most naturally raise such a subject directly with Dr. Kerns. Dr. Kerns testified that Cheryl's complaints to him covered the pay docking incident, the job evaluation, and her low level clerical assignments. No charge of sexual harassment was made to him by Cheryl, although she did accuse chief nurse Judy Warwick of on-the-job harassment. Dr. Kerns characterized as

an "outright lie" the claim of Cheryl that Kerns would appoint her head nurse if she would "come across."

Mandia was terminated on October 12, 1982, along with another employee, Mandia's subordinate, A.L. Rice, by William Edmunds, pursuant to a specific order by Jack Oppasser. On October 11, 1982, Oppasser had learned of a surreptitious wire tapping incident of an employee's telephone call made on June 21, 1982. Oppasser had been highly indignant at learning of this episode.

As a result of a number of personnel matters that had arisen at the Beaver Valley plant, Edmunds and Oppasser discussed Mandia's general competence to handle this assignment and an experienced man was interviewed as a replacement for him on September 27 and 28, 1982. They considered assigning Mandia to another position. The person interviewed was made manager at Beaver Valley on October 15, 1982. At Mandia's request he was allowed to resign effective October 15, 1982. Mandia and Rice were permitted to remain on the payroll until November 30, 1982, and Mandia performed some services for the company, appearing at a deposition in its behalf on November 3, 1982. On October 12, 1982, it was announced at the plant that Mandia had resigned as of October 15, 1982. H. Fernard Price, Mandia's former assistant, was designated to take over Mandia's duties at the plant.

Mandia made several efforts to have the decision reversed, or to seek a transfer elsewhere in the company, citing strong mitigating circumstances involving the company's prior knowledge and condonation of surreptitious tape recording of phone calls. Mandia met with Simmons to arrange a meeting with Oppasser, and on November 1, 1982 met with Oppasser. At neither of said meetings did Mandia raise the claim that his wife had been sexually harassed. Oppasser told Mandia at the November 1, 1982 meeting that he would review the discharge. On November 10, 1982 Oppasser informed Mandia that he had reviewed the discharge and would not

reverse it. Oppasser testified that he did not then know that Cheryl Mason had filed a sexual harassment charge on November 3, 1982 with the EEOC. Oppasser testified that as of October 1982 he didn't know that Mandia was married to Cheryl Mason.

On November 5, 1982 ARCO Chemical received a copy of the EEOC charge at the Beaver Valley plant. Personnel at the plant advised Edmunds in Philadelphia of receipt of the charge, and Edmunds asked that a copy be forwarded to him. He received this on or about November 8, 1982. Although Edmunds and Oppasser met between November 8 and November 10, 1982, there is no direct evidence that Oppasser learned of the charge before November 10, 1982. Oppasser denies this, and testified that he first learned of it on November 16, 1982. Plaintiff only argues that he must have known earlier because of the close departmental relationship between Edmunds and Oppasser.

■■■■ The EEOC administrative investigator found no probable cause for Cheryl Mason's complaint of sexual harassment. However, we need not make a finding that the sexual harassment actually occurred. The test in retaliation cases is whether plaintiff had a reasonable belief that an employment practice violated Title VII. *See Novotny v. Great American Federal Savings and Loan Association,* 539 F.Supp. 437 (W.D.Pa.1982). Even if a charge filed with the EEOC is found to be without merit, the employee is protected in making that charge by Section 2000–3(a). *Hicks v. ABT Assoc.,* 572 F.2d 960 (3d Cir.1978).

Mandia filed a charge of retaliatory discharge with the EEOC on November 16, 1982. The EEOC administrative procedure found no probable cause.

■■■■ The ultimate question is, was Mandia terminated because of his wife's EEOC charge? Plaintiff bears the ultimate burden of proof on this issue. While there is a time relation between Mandia's termination and the wife's charge, to conclude from that relation alone that they were causally related would be pure speculation.

■■■■ While we have Mandia's assertion that the complaints of sexual harassment were orally transmitted to his superiors, and the denial of the superiors that they received such reports, all of the corroborating documentation from Robert Mandia and Cheryl Mason fail to support Richard Mandia's claim. With respect to whether Oppasser knew of the EEOC charge on November 11, 1982 when he refused to reconsider the the termination of October 12, 1982, we can only rest on mere speculation. His testimony refutes this. The time-stamps on his incoming correspondence refutes this. Plaintiff's counsel's argument that he must have known because of his corporate relationship to those who were informed, and the critical importance of this issue, ignores the fact shown by the evidence that the Beaver Valley plant is only one of several widely spaced plants under his jurisdiction, and that Nurse Mason was only one of the many personnel problems that he faced, and actually she and the Medical Department were not under his jurisdiction.

Furthermore, the employer has shown a bonafide business reason for the dismissal of October 12, 1982, which may seem harsh, but is entirely legitimate. Even before that time Mandia's superiors were disturbed at the way he was handling his job, were actively seeking and interviewing a replacement, and announced his replacement by October 19, 1982, before the date of Cheryl Mason's charge.

Therefore, plaintiff has failed to carry his burden of proof and judgment will be entered for defendant.

The foregoing opinion shall constitute the court's findings of fact and conclusions of law.